# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs April 1, 2014

## STATE OF TENNESSEE v. RACRIS THOMAS

**Direct Appeal from the Criminal Court for Shelby County**
**No. 11-07851    Lee V. Coffee, Judge**

---

**No. W2013-00851-CCA-R3-CD  -  Filed October 27, 2014**

---

A Shelby County Criminal Court Jury convicted the appellant, Racris Thomas, of two counts of especially aggravated kidnapping, one count of aggravated robbery, one count of attempted aggravated robbery, and one count of being a convicted felon in possession of a handgun. The trial court imposed a total effective sentence of seventy years in the Tennessee Department of Correction. On appeal, the appellant contends that the evidence is not sufficient to sustain his convictions and that the trial court erred by refusing to declare a mistrial after the jury instructions revealed that the felony underlying the charge for being a felon in possession of a handgun was a prior aggravated robbery. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., J., joined. JERRY L. SMITH, J., not participating.

Juni S. Ganguli, Memphis, Tennessee, for the appellant, Racris Thomas.

Robert E. Cooper, Jr., Attorney General and Reporter; Melissa Harrison, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Ann Schiller, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Factual Background

The appellant was charged with two counts of especially aggravated kidnapping, one

count of aggravated robbery, one count of attempted aggravated robbery, one count of aggravated burglary, one count of employing a firearm during the commission of an aggravated burglary, and one count of being a convicted felon in possession of a handgun.

At trial, Vanzelle Clark testified that around 9:30 or 10:00 p.m. on April 11, 2011, he and his girlfriend, Keshya McClinton, returned to his apartment in her Honda Civic, which Clark was driving. Clark parked, and McClinton got out of the car and walked to the trunk. After hearing someone speak to McClinton, Clark got out of the car and saw a man standing beside McClinton. The man was wearing a ski mask, and his hair was in "dreads." The man was wearing a black and red shirt and black pants and was carrying a long gun and a shorter gun. The man pointed the guns at Clark and said, "'Go upstairs. Come on. Hurry up. I'm going to shoot you in your face. Let's go." The prosecutor showed Clark Exhibit 2, a .38 caliber pistol, and Clark stated that it resembled the shorter gun.

Clark said that he informed the gunman that the front door of his apartment, which was upstairs, was locked and that they could not enter the apartment through that door. Clark explained that he typically used the back door because the front door was locked with a deadbolt to which he did not have a key. Nevertheless, the gunman insisted that they go upstairs. Clark did not think he could escape and walked upstairs, followed by McClinton and then the gunman. At the top of the stairs, Clark noticed that the lock on his front door had been broken. He pushed the door open, walked into the living room, and glanced around. He noticed that his Xbox 360 video game system, video games, DVDs, and television were missing. Because the appellant was not directly behind Clark, Clark was able to escape out the back door. He went to a friend's residence nearby and called the police.

Clark said that he remained on the telephone with the police dispatcher until the police arrived approximately seven to ten minutes later. At that point, he went outside to speak with the officers and saw McClinton already speaking with them. After giving a statement, Clark returned to his apartment and discovered that a television from his bedroom had also been taken.

Clark said that the gunman never removed his mask that night. Nevertheless, Clark thought he recognized the gunman from "[h]is voice and body language, his dreads. . . . Talking to him before and being around him a couple of times. I knew like it was like the way he act, the way he did, how he – how he sound." Clark thought the gunman was someone he had met through friends. Clark did not tell the police that he suspected the appellant was the gunman because he was afraid and was not completely certain of the identification at that time.

Clark said that at the request of Sergeant Shawn Hicks, he went to the police station

around 5:00 p.m. on August 16, 2011, to view a photograph lineup. He identified a photograph of the appellant, whom he knew as "Chris," as the gunman. Clark asserted that after seeing the appellant's photograph in the lineup, he was "a hundred percent (100%) sure" of his identification of the appellant. Approximately one week later, the police returned Clark's Xbox and video games, but his televisions and DVDs were never found.

Clark acknowledged that on November 4, 2011, he and McClinton testified at the appellant's preliminary hearing in general sessions court. During the hearing, Clark identified the appellant as the gunman. Clark also identified the appellant at trial as the gunman.

On cross-examination, Clark stated that the crime occurred on a Monday night and that he had not been drinking. He lived in apartment number four, which was located on the second floor of the apartment building. Clark said that the gunman was wearing a black and red ski mask that covered all of his face, except his eyes and mouth, and that the man's "dreads" were showing. Clark walked unhurriedly up the stairs, followed by McClinton and the appellant, and Clark entered the apartment first. By the time the appellant walked into the apartment, Clark had exited the back door, leaving McClinton behind with the appellant. Clark called the police, but the appellant was gone when they arrived.

Clark acknowledged that he told the police that he had never seen the gunman previously and that he thought the gunman was someone named "Chris." He denied that he had ever met a man named Danny Howard. Clark agreed that he first identified the appellant as the perpetrator over four months after the offense. He denied that Sergeant Hicks told him whom to identify.

Keshya McClinton testified that on April 11, 2011, she and Clark were dating and lived together at the French Village Apartments. That evening, Clark drove her back to the apartment complex. After he parked the car, McClinton got out and went to the back of the car to retrieve her backpack. A man with dreads and wearing a ski mask approached them. He was wearing a red and black shirt and dark pants, and he was holding a small, black revolver in one hand and a "silver with a long nose revolver" in the other hand. The prosecutor showed McClinton a photograph entered as Exhibit 2, and she identified it as the small revolver the gunman carried. McClinton said that the man pointed the guns at her and instructed her to give him all her money. McClinton, shocked and terrified, turned toward the gunman. About the same time, Clark got out of the car and walked around the car toward McClinton. McClinton told the gunman that she did not have anything, and he ordered them to go upstairs. At first, McClinton was confused, but when she realized the gunman was serious, she complied.

McClinton said that Clark walked up the stairs first, followed by her and then the gunman. The gunman pointed the guns at her back and occasionally shoved a gun into her back to encourage her to keep moving.

McClinton explained that she and Clark never used the front door because

> we had asked the apartment people to give us a dead bolt for those doors, but all it had was just a simple lock and a chain from the inside. So we always used the back door because that door wasn't secured correctly unless you used the chain from the inside.

Clark tried to tell the gunman that they could not get into the apartment through the front door. The gunman responded that the door was already open. At the top of the stairs, McClinton saw that the front door had been kicked in.

McClinton said that the gunman told them to go inside the apartment. Clark complied and was able to "slip out" the back door. McClinton feared being alone with the gunman. She looked around the apartment and saw that it had been ransacked. Specifically, she noticed that the television and Xbox were missing from the living room.

McClinton said that the gunman was surprised by Clark's escape and repeatedly asked, "'Where is he, where is he?'" The gunman forced McClinton to walk into the bedroom. He instructed her to call Clark and tell him to return, and she complied. The gunman spoke with Clark and told him that if he did not come back, the gunman would kill McClinton. Clark said he would return.

McClinton said that the gunman went into the living room. She remained in the bedroom until she heard the gunman's "voice kind of leave." McClinton tried to leave but saw the gunman at the bottom of the stairwell. He had his mask off and was speaking on a cellular telephone. He saw McClinton and told her to go back upstairs. She ran upstairs, and the gunman followed her. At the top of the stairs, the gunman asked her why she had tried to leave and ordered her to return to the bedroom. The gunman then changed his mind and ordered her to go downstairs to her car. McClinton could see the gunman's face clearly because he had removed the mask.

McClinton said that the gunman forced her into the passenger seat of her car and closed the door. The gunman went around to the driver's side and demanded that McClinton give him the keys to the car. McClinton responded that Clark had the keys. The gunman searched for the keys in the glove compartment then exited the car. He told McClinton to

get out of the car and walk to the other side of the apartment building, and she complied. They heard sirens, and the gunman became agitated and frightened. McClinton tried to calm him by telling him that the police were not coming for him. The gunman tried to force her into the alley beside the apartment building, but she resisted, fearing what might happen in the alley. The gunman demanded that McClinton give him her wallet. She removed the wristlet wallet that she was wearing, which contained her driver's license, credit cards, insurance cards, and cash. When she handed the wristlet to the gunman, he ran away. McClinton ran the other way and used her cellular telephone to call 911.

McClinton said that when the police arrived, she returned to the apartment with them. She noticed that one television from the bedroom, one television from the living room, an Xbox, games, and her yellow laptop computer were missing. She walked down the alley with the police and saw her laptop computer propped against a piece of wood.

McClinton said that she had never seen the gunman prior to the robbery. She described her assailant to the police. Clark also spoke with the police. McClinton said she did not speak with Clark because she was mad at him for leaving her.

McClinton said that approximately four months later, on August 16, 2011, Sergeant Hicks contacted her and asked her to come to the police station. She did not recall Sergeant Hicks telling her the name of the suspect, and she did not try to find photographs of the appellant on the internet in order to identify him as the suspect. After she arrived at the police station, she was shown a photograph lineup, and she immediately identified the appellant as her assailant. She asserted that the police did not tell her whom to identify. Additionally, at the preliminary hearing and at trial, she identified the appellant as the gunman. She said that she was one hundred percent certain of her identification, explaining, "I'll never forget what he looked like, and I kn[o]w that was him."

McClinton was shown a photograph of Danny Howard and said that she was certain he was not the gunman. McClinton explained, "The person that robbed me was much darker complected and – he was just much darker and he was – looked a little older. This guy looks really young."

On cross-examination, McClinton said that the crime occurred at approximately 10:40 p.m. She did not see the appellant's initial approach and noticed him at the back of the car when he spoke. He was wearing a ski mask that left only his mouth and eyes visible. After Clark escaped, she called his cellular telephone, and the appellant spoke with him. Thereafter, the appellant left the apartment, and McClinton sneaked down the stairs. The appellant was at the bottom of the stairs and had his back to her.

-5-

McClinton said that she described the gunman to the police as having "short braids and dreads[,] . . . he was a medium to smaller build and he was about five-eight or five-nine." Her description was general because she was "terrified." McClinton denied that she knew anyone named Danny Howard. McClinton said that even if Sergeant Hicks had revealed the name of the suspect, "that wouldn't matter as far as his face because I wasn't going off a name."

Christopher Sanders, a crime scene officer with the Memphis Police Department, testified that he arrived at the crime scene at approximately midnight. He learned that McClinton and Clark had been robbed outside, that all three went into the apartment, which the suspect ransacked, that McClinton and the suspect went outside, and that the suspect rummaged through the car. Officer Sanders took photographs of the scene and "dusted" for fingerprints.

Memphis Police Sergeant Shawn Hicks testified that he became involved in the investigation while executing a search warrant for a gun and proceeds from an unrelated robbery. The search was conducted on August 10, 2011, at the residence of Lori Howard, which was located on Rockledge Drive in Bartlett. Sergeant Hicks knew that Ms. Howard was a convicted felon and that she was dating the appellant. When Sergeant Hicks arrived at the residence, Ms. Howard was speaking with a female realtor about the sale of her home. The appellant's green Cadillac and Ms. Howard's red Chevrolet Camaro were parked in the garage.

Sergeant Hicks said that when he initially spoke with Ms. Howard, she denied that the police would find anything. During the ensuing search, Sergeant Hicks found thirty-three rounds of .38 caliber ammunition and a box of Winchester shells in a file cabinet in Ms. Howard's bedroom. Sergeant Hicks informed Ms. Howard that he had found the ammunition. She then told him that the gun was in a bag in her bedroom closet, and Sergeant Hicks found a Rossi .38 caliber revolver where Ms. Howard said it would be. Duct tape was wrapped around the handle of the gun, and Ms. Howard was arrested for being a felon in possession of a firearm. Sergeant Hicks also found a blue duffle bag containing an Xbox and several video games in the closet. The gun was admitted at trial as Exhibit 2.

Sergeant Hicks said that he called crime scene officers to investigate the scene and returned to the Robbery Bureau Office. The next day, he spoke with Ms. Howard. She revealed that the gun, ammunition, Xbox, and games belonged to the appellant and that "she was holding the items at her house while he was in custody."

Sergeant Hicks said that thereafter, he investigated ownership of the Xbox. He explained that when "someone gets an Xbox, they can play online but they have to register

. . . [and] create an account." When he looked at the "Xbox Gold Account" associated with the gaming system, he found McClinton's name. Further investigation revealed that in April, McClinton had reported the theft of an Xbox. Sergeant Hicks contacted McClinton and asked her to describe the thief. She said that "he was a male black, apparently, he had short dreads, and she gave me his height and weight." The description matched the appellant. McClinton also said that the thief carried two guns, one of which was a .38 revolver with tape around the handle.

Sergeant Hicks said that after speaking with McClinton, he decided to compile a photograph lineup containing a photograph of the appellant and five others who closely resembled him. Before McClinton viewed the lineup, Sergeant Hicks advised her that the suspect's photograph may or may not be in the lineup and that he was not permitted to "give her any hints whatever." He informed her that she was not required to identify anyone from the lineup. McClinton identified the appellant as the perpetrator in less than one minute. Following the identification, McClinton left the room, and Clark came in to view the lineup. Sergeant Hicks gave the same cautionary instructions to Clark. Clark immediately identified the appellant as the perpetrator. Clark also identified the Xbox and games as his, and the police released the property to him.

Sergeant Hicks said that the crime scene officers took fingerprints from the laptop computer found near the apartment. Fingerprint technicians later determined that the fingerprints were of such poor quality that no comparisons could be made. Sergeant Hicks said that he was not surprised because obtaining good fingerprints was difficult.

Sergeant Hicks said that he obtained audiotaped recordings of the telephone calls the appellant had while in jail. On June 1 at 10:28 a.m., the appellant had another inmate call Ms. Howard and ask her to "get his stuff, the Cadillac and the Xbox." Later that day, at approximately 4:42 p.m., the appellant called Ms. Howard and instructed her to retrieve his Cadillac and his Xbox. Ms. Howard passed the telephone to a man who told the appellant that they had obtained the Xbox.

On cross-examination, Sergeant Hicks acknowledged that Ms. Howard had a prior conviction of burglary and other offenses he could not remember. During his investigation, Sergeant Hicks learned that Ms. Howard's son, Danny Howard, had a pending aggravated robbery charge. A photograph of Mr. Howard was introduced as an exhibit.

Sergeant Hicks said that he spoke with Ms. Howard on August 13, 2011, and that she initially lied to him. He did not find a ski mask during his search of Ms. Howard's home. He acknowledged that he mistakenly said that Ms. Howard was charged with being a convicted felon in possession of a firearm; instead, she was charged with a "previous robbery."

-7-

Sergeant Hicks said that on August 16, 2011, he spoke with Clark and McClinton. Clark said that during the robbery, he abandoned McClinton and that the gunman was wearing a ski mask. Sergeant Hicks acknowledged that Clark's identification of the perpetrator, who was wearing a ski mask, was "bizarre." He asked Clark how he could be sure of his identification, and Clark responded that he knew the perpetrator.

Sergeant Hicks said that when he asked the victims to view the lineup, he told them, "'We have someone – we have a possible suspect in regards to your case, and I would like to speak to you – come to the Robbery Office and discuss with you about this case, and is it possible that you would be able to identify him if you saw him again in a photograph?'" He conceded that he may have mentioned the appellant's name, but he could not say for certain. He acknowledged that the appellant's photograph could have been found online. Sergeant Hicks advised the victims that the police had a suspect who may or may not have been the perpetrator. He cautioned that he could not give hints as to the perpetrator and that they should not guess at the identification. He said that he did not put his hand on the lineup to suggest who should be identified. Sergeant Hicks did not include Mr. Howard's photograph in the lineup.

Sergeant Hicks said he did not ask for the Xbox to be fingerprinted because it was not from a "fresh crime" scene, and he could not be sure how many times it had "changed hands."

On redirect examination, Sergeant Hicks said that he was familiar with Ms. Howard and the appellant because they were the "subject[s] of an unrelated matter"; Mr. Howard was not involved in the other matter, and Sergeant Hicks found nothing in the investigation to suggest that Mr. Howard was involved in the instant robbery.

Lori Howard testified that she was dating the appellant during April through August 2011 and that the appellant was also living with her. On August 13, 2011, the police executed a search warrant on her residence to search for a pistol. She initially told the police that she knew nothing about the gun. However, after the police found ammunition in her bedroom, she showed them where the gun was located. Ms. Howard said that the appellant left the gun at her house.

Ms. Howard explained that after the appellant was arrested on an unrelated charge, he called her from jail and told her to get his Cadillac and his belongings and take them to her house. Among the appellant's belongings were an Xbox, video games, clothes, shoes, and a tattoo gun. After she retrieved the items, she parked the car in her garage and put the belongings in her closet.

Ms. Howard said that the Xbox had been at her house but that the appellant had packed his things, including the Xbox, and taken them with him when "the police were looking for him." Ms. Howard said that Mr. Howard was her son and that he did not own an Xbox.

On cross-examination, Ms. Howard said that Mr. Howard was born on March 21, 1992, and that he had been convicted of aggravated robbery. Ms. Howard acknowledged that she had been convicted of burglary of a building and theft.

Ms. Howard said that the appellant moved in with her approximately one month after they started dating. Her mother stayed with them two or three nights a week. Mr. Howard moved in with his girlfriend because he did not like the appellant. Ms. Howard denied giving the appellant an Xbox. She said the appellant often took the Xbox with him when he left her residence so he could play games at his mother's house.

At the conclusion of the State's proof, the parties agreed to stipulate that "[o]n June 26, 2002, Defendant Racris Thomas was convicted of the crime of aggravated robbery, a felony, under Indictment No. 01-06754, in Shelby County, Tennessee."

As the defense's first witness, Robbie M. Harris, the appellant's mother, testified that in December 2010 she was living in an apartment on Silvercreek Drive in Bartlett. Her minor daughter, her sister, and the appellant were also living there. Sometime between December 2010 and May 2011, she met Ms. Howard, whom the appellant was dating. Ms. Howard frequently came to Harris's house with presents such as food, an "Mp3 player" for Harris's daughter, and clothes for Harris. Ms. Howard also gave the appellant clothes, shoes, a video game, and an Xbox, which came in a white box with "Xbox" written on it in green.

Harris said that the appellant frequently stayed with Ms. Howard but that he never moved in with her. The appellant took the Xbox with him when he visited Ms. Howard. Ms. Howard occasionally repossessed the Xbox when she was angry with the appellant. In May 2011, after the appellant was incarcerated, Mr. Howard came by Harris's house and took the Xbox. A few weeks later, Harris's residence was burglarized, but no one was ever prosecuted for the burglary.

On cross-examination, Harris said that she could not explain why the serial number on the Xbox indicated that it belonged to Clark and McClinton. She said that Ms. Howard indicated that she bought it for the appellant.

Sharion Renee Cogbill, the appellant's aunt, testified that from December 2010 to May 2011, she was living with the appellant, Harris, and Harris's daughter. After the

appellant and Ms. Howard began dating, Ms. Howard frequently came to Harris's house. Ms. Howard brought the appellant clothes and shoes and brought his sister fingernail polish and lotions. Ms. Howard also gave the appellant an "Mp3 player." Cogbill thought Ms. Howard "was just kind of trying to get in good with the family."

Cogbill recalled being in her bedroom on one occasion when the appellant and Ms. Howard came to the residence. Ms. Howard had bought the appellant an Xbox, which was in its original packaging. Harris asked Ms. Howard, who was unemployed, how she could afford to buy the game system. Ms. Howard responded, "'Well, I get a check.'" Cogbill recalled that on a later occasion, Ms. Howard came to Harris's home and took the Xbox after arguing with the appellant. At some point, the Xbox was no longer in Harris's home, but Cogbill was unsure when it disappeared.

The jury was unable to reach a verdict on the charges of aggravated burglary and employing a firearm during the commission of an aggravated burglary. However, the jury found the appellant guilty of two counts of especially aggravated kidnapping, one count of aggravated robbery, one count of attempted aggravated robbery, and one count of being a convicted felon in possession of a handgun. The trial court imposed sentences of twenty-five years for each especially aggravated kidnapping conviction, twelve years for the aggravated robbery conviction, six years for the attempted aggravated robbery conviction, and two years for the felon in possession of a handgun conviction. The court ordered the sentences to be served consecutively for a total effective sentence of seventy years.

On appeal, the appellant contends that the evidence is not sufficient to sustain his convictions and that the trial court erred by refusing to declare a mistrial after the jury instructions revealed that the felony underlying the charge for being a felon in possession of a handgun was a prior aggravated robbery.

## II.  Analysis

### A.  Sufficiency of the Evidence

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the

evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

Tennessee Code Annotated section 39-13-305(a)(1) defines especially aggravated kidnapping as "false imprisonment, as defined in § 39-13-302 . . . [a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." False imprisonment is defined as the knowing removal or confinement of another unlawfully so as to interfere substantially with the other's liberty. Tenn. Code Ann. § 39-13-302(a).

As charged in this case, aggravated robbery occurs when an offender commits a robbery with a deadly weapon or by displaying any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon. Tenn. Code Ann. § 39-13-402(a)(1). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). A theft of property occurs when someone, with the intent to deprive the owner of property, knowingly obtains or exercises control over the property without the owner's effective consent. Tenn. Code Ann. § 39-14-103. A criminal attempt occurs when a person acting with the kind of culpability otherwise required for the offense:

> (1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;
>
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
>
> (3) Acts with intent to complete a course of action or

cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a)(1)-(3). Finally, Tennessee Code Annotated section 39-17-1307(c)(1) provides that "[a] person commits an offense who possesses a handgun and has been convicted of a felony."

The appellant does not challenge the specific elements of the offenses; instead, he contends that the State failed to prove his identity as the perpetrator. He acknowledges that Clark and McClinton both identified him as the gunman. He asserts, however, that "the identification was tainted" because Sergeant Hicks "might have" mentioned the appellant's name to McClinton, and she could have found the appellant's photograph on the internet. The appellant contends that the perpetrator was his co-defendant's son, Danny Howard, who had a pending aggravated robbery charge.

Taken in the light most favorable to the State, the evidence at trial revealed that the appellant approached Clark and McClintock in the parking lot of their apartment building. The appellant was holding a small black revolver with silver duct tape wrapped around the handle in one hand and a silver revolver in his other hand. Additionally, the appellant was wearing a mask. The appellant demanded money and ordered them upstairs to their apartment, where the door was kicked open and the lock broken. During the encounter, the appellant took McClontock's wallet. McClintock saw the appellant without his mask for approximately ten minutes. Two televisions, an Xbox, video games, DVDs, and a laptop computer were missing from the apartment. The Xbox and a gun matching the description of the appellant's gun was found in a closet at the appellant's girlfriend's apartment. The jury heard the proof regarding the identification and chose to accredit the evidence presented by the State. We conclude that the evidence is sufficient to sustain the appellant's convictions.

## B. Mistrial

The appellant contends that the trial court erred by denying his motion for a mistrial after the trial court revealed that the appellant had a prior conviction of aggravated robbery. We conclude that the trial court erred but that the error was harmless.

The record reflects that the trial court filed a copy of its proposed jury instructions on February 12, 2013. Defense counsel did not object to the proposed instructions. The trial was conducted on March 25, 2013. During opening instructions to the jury, the trial court,

in accordance with the filed instructions, advised the jury as follows:

> The essential elements of Convicted Felon in Possession of a Handgun in Count 7 of the indictment are as follows:
>
> (1) that the Defendant had been convicted of Aggravated Robbery; and
>
> (2) that the Defendant, after such felony conviction, possessed a handgun; and
>
> (3) that the Defendant acted either intentionally, knowingly or recklessly.

At the conclusion of the opening instructions, defense counsel said, "Judge, on page 3 of the opening instructions, it has the offense for which Mr. Thomas had been convicted of. I didn't notice this until the instructions were being read. . . . We respectfully ask for a mistrial." The trial court responded:

> [I]t is the law in the State of Tennessee. We give the limiting instruction on convicted felon in possession of a handgun. We tell the jury in those instructions that – and it is part of the instructions on that offense that if they find from the evidence that the Defendant has been convicted of some other offense, other than the case that he's on trial for, that the jury can consider – "If you find that the Defendant has been convicted of another crime or crimes other than that for which he is presently on trial, you may not consider such evidence as proof of his disposition to commit the crime for which he is on trial, and you may consider any prior felony conviction as an element of the offense of being a convicted felon in possession of a handgun and for no other purposes."
>
> . . . .
>
> [The case law establishes] that being a convicted felon is, in fact, an essential element of the offense of being a convicted felon in possession of a handgun, and it is not error, it is something that a jury has to be informed of because it is an element of the offense, and that is something that the State of

-13-

Tennessee has to prove, and the Court shall give a limiting instruction that indicates that they can consider that only for the purpose as an element of that crime and for no other purposes. . . . I will note the objection for the record, but it is the law in the State of Tennessee, and I will overrule the request for a mistrial.

At the conclusion of the State's proof, the State and defense counsel agreed to stipulate that the appellant previously had been convicted of aggravated robbery. After reading the stipulation, the court instructed the jury,

[A]ll parties are stipulating that he does, in fact, have this conviction. And you can consider this only for the purpose of making a determination as to whether or not he is, in fact, a convicted felon and for no other reason; does everyone understand that?

On appeal, the appellant contends that the trial court abused its discretion by informing the jury of his prior aggravated robbery conviction. He acknowledges that evidence of the prior conviction was relevant to the charge of being a convicted felon in possession of a handgun. However, he asserts that "a jury is not required to hear the specific crime of which a defendant has been convicted – only that he has been convicted of a qualifying prior felony." In support of his claim, he cites Old Chief v. United States, 519 U.S. 172 (1997). Additionally, he contends that he "was tried for aggravated robbery – and the jury was told of his prior conviction for the same offense. The jurors were invited to infer guilt from propensity." Accordingly, he argues that the trial court should have sustained his motion for a mistrial.

A mistrial is a procedural device that is only appropriate when the trial cannot continue without causing a miscarriage of justice. State v. McPherson, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994). In other words, there must be a "'manifest necessity'" for a mistrial to be declared. State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). "The decision of whether to grant a mistrial is within the sound discretion of the trial court. This court will not disturb that decision absent a finding of abuse of discretion." State v. Mathis, 969 S.W.2d 418, 422 (Tenn. Crim. App. 1997) (citations omitted).

This court has previously explained,

The defendant in Old Chief was charged with possession of a firearm by a convicted felon in violation of a federal statute. . .

-14-

. Old Chief offered to stipulate to his prior felony conviction, arguing that his offer of stipulation rendered evidence of the name and nature of his prior offenses inadmissible as irrelevant and unfairly prejudicial. The Government refused to join the stipulation, arguing that it had a right to present its own evidence of the defendant's prior convictions.

State v. James, 81 S.W.3d 751, 761-62 (Tenn. 2002). In Old Chief, the United States Supreme Court held that

> "[w]hen the point at issue is a defendant's legal status, dependent on some judgment rendered wholly independently of the concrete events of later criminal behavior charged against him[,] . . . the fact of the qualifying conviction is alone what matters.
>
>          . . . .
>
> Given these peculiarities of the element of felony-convict status and of admissions and the like when used to prove it, there is no cognizable difference between the evidentiary significance of an admission and of the legitimately probative component of the official record the prosecution would prefer to place in evidence."

James, 81 S.W.3d at 762 (quoting Old Chief, 519 U.S. at 190-91). Our supreme court found the rationale in Old Chief to be persuasive and held "that when the sole purpose of introducing evidence of a defendant's prior convictions is to prove the status element of the offense, and when the defendant offers to stipulate his status as a felon, the probative value of the evidence is, as a matter of law, outweighed by the risk of unfair prejudice." Id.

Initially, we note that the appellant has risked waiving this issue because the trial court filed a copy of the preliminary instructions more than one month prior to trial, giving him ample opportunity to object to the instructions before they were given. See Tenn. R. App. P. 36(a) (providing that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"). That said, we agree with the appellant that the trial court erred by informing the jury about the prior aggravated robbery conviction during the preliminary instructions. Nevertheless, we conclude that the error was harmless. At the conclusion of the State's proof, the trial court

-15-

read the agreed stipulation regarding the prior conviction to the jury. Immediately thereafter, the trial court cautioned the jurors that they could consider the prior conviction only to determine the appellant's guilt on count seven. Moreover, during the court's final instructions to the jury at the conclusion of proof, the court reiterated that the jury could consider the appellant's prior conviction only as an element of his being a convicted felon in possession of a handgun and not "as proof of his disposition to commit the crime for which he is on trial." This court has previously concluded that a "trial court's limiting instruction 'provided an adequate safeguard against any potential prejudice possibly engendered by the admission of the prior conviction.'" State v. Lankford, 298 S.W.3d 176, 182 (Tenn. Crim. App. 2008) (quoting United States v. Moore, 917 F.2d 215, 234-35 (6th Cir. 1990)). Furthermore, the State's case was strong. Accordingly, we conclude the trial court's giving the instruction was harmless error and did not require the grant of a mistrial.

### III. Conclusion

In sum, we conclude that the evidence is sufficient to sustain the appellant's convictions and that the trial court did not did not abuse its discretion by denying the appellant's motion for mistrial. Therefore, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE